**[Cite as *State ex rel. Yost v. Wylie*, 2024-Ohio-2498.]**

## IN THE COURT OF APPEALS OF OHIO
### SIXTH APPELLATE DISTRICT
### WOOD COUNTY

State of Ohio, ex rel. Dave Yost,
Ohio Attorney General

Court of Appeals No. WD-23-040

    Appellee

Trial Court No. 2021 CV 0204

v.

Thomas J. Wylie, Sr., et al.

**DECISION AND JUDGMENT**

    Appellants

Decided: June 28, 2024

* * * * *

Dave Yost, Ohio Attorney General, and
Nicole DiVittorio-Kalmbach, Catherin English,
and Morgan Trivunic, Assistants Ohio Attorneys
General, for appellee.

Robert J. Bahret and Andrew J. Ayers, for appellants.

* * * * *

**ZMUDA, J.**

### I. Introduction

{¶ 1} This matter is before the court on appeal from the judgment of the Wood

County Court of Common Pleas on July 24, 2023, following a bench trial. The trial court

entered judgment in favor of plaintiff-appellee, the state of Ohio on behalf of the Ohio

Environmental Protection Agency (Ohio EPA), and against defendants-appellants, Thomas J. Wylie, Sr., Nicholas Wylie, Wylie and Sons Sand and Stone, Wylie & Sons Landscaping, LLC, Thomas J. Wylie, Sr., d.b.a. Ranch and Arena, and Lisa M. Wylie (collectively, "the Wylies"). The trial court found the Wylies jointly and severally liable for violations of Ohio's water pollution control laws and awarded damages that included civil penalties and injunctive relief. For the reasons that follow, we affirm.

## II.  Facts and Procedural History

{¶ 2} This matter concerns four sites: the Wood County property on Glenwood Road and the Fulton County properties at three locations: the County Road 5 property, 1616 County Road B, and 1640 County Road B.

{¶ 3} The Glenwood Road site consists of five contiguous parcels in Perrysburg, Ohio, owned by Thomas Wylie, Sr. ("Wylie"), his son, Nicholas Wylie ("Nicholas"), and his wife, Lisa Wylie ("Lisa").[1] The 19-acre Glenwood Road site was purchased in stages, between 2013 and 2016, and Wylie converted the property from farmland to a sand and gravel quarry, operated as Wylie and Sons Sand and Stone. The Ohio Department of Natural Resources (ODNR) issued a permit for surface mining on the property. As part of operations, Wylie and Sons dewatered the quarry and pumped the water removed into a tributary of Dry Creek. In addition, the Wylies placed mining waste near the tributary,

---

[1] Based on testimony, Wylie and Lisa divorced sometime after 2012, but Wylie remained on the deeds of properties he claimed were awarded to Lisa in the divorce. The record owners of the fifth parcel on Glenwood Road are Nicholas Wylie and Allen Joel Brenner. Brenner was not named as a defendant and is not a party on appeal.

2.

causing the waste to enter the waterway through runoff. Ohio EPA investigated and noted the discharge, both from the mine and through runoff from the piled waste. In 2018, after receiving numerous notices of violations, Wylie obtained a permit to discharge into the creek from Ohio EPA.

{¶ 4} The site at County Road 5 abuts a tributary of Fewless Creek. Wylie and Lisa Wylie purchased the property in 2000. Wylie and Sons Landscaping mined sand from the site, with mining activity continuing until the Wylies sold the property in 2019. In the process of mining, the Wylies dewatered and discharged the water removed from the quarry into a tributary of Fewless Creek. Ohio EPA investigated and noted the discharge without a permit. The Wylies did not obtain a permit from the Ohio EPA prior to selling the property.

{¶ 5} The County Road B property consists of two contiguous parcels, about 47 acres. Wylie and Lisa Wylie purchased the 1616 County Road B parcel in 2001. They divided and sold lots on part of that parcel, with offices and a parking lot for Wylie & Sons Landscaping, LLC constructed on the remaining property. Prior to development, the Army Corps of Engineers identified high quality isolated wetlands on the property, and they sent notice of the presence of these wetlands to Wylie, indicating Ohio EPA regulated in this area. Wylie placed fill or dredge in the wetlands without a permit from Ohio EPA. Investigation by Ohio EPA noted the loss of wetlands and the improper fill materials placed by the Wylies as a result of development.

3.

{¶ 6} Wylie and Lisa Wylie also purchased the property at 1640 County Road B. They developed this land for commercial use as a horse ranch, operated as WB Ranch and Arena. The ranch includes a riding arena and accessory buildings. The Wylies installed an unpermitted waste treatment system for the WB Ranch business, and after Ohio EPA investigated and requested "as-built" engineering plans for the system, to process the permit after installation, the Wylies failed to submit plans to Ohio EPA as part of the permit application process.

{¶ 7} On June 4, 2021, the state, on behalf of Ohio EPA, filed a complaint for injunctive relief, alleging violations and seeking civil penalties. The state named the record owners for the three properties, Wylie, Nicholas Wylie, and Lisa Wylie. The state also named the businesses that operated on the properties, Wylie and Sons Sand and Stone, Wylie & Sons Landscaping, LLC, and Thomas J. Wylie, Sr. d.b.a. WB Ranch and Arena (collectively, the "Wylies").

{¶ 8} The complaint alleged various violations of R.C. Chapter 6111, asserting six counts as follows:

> Count One: Between September 2, 2016 and February 21, 2018, allowing storm water discharges associated with industrial activity at the Glenwood Road site without obtaining a permit to mine sand and gravel, and seeking joint and several liability to pay a civil penalty up to $10,000 for each day of each violation.

> Count Two: Between September 2, 2016 and February 21, 2018, dewatering and discharging collected stormwater and groundwater from the

4.

bottom of the quarry at the Glenwood Road site through a pipe into an unnamed tributary to Dry Creek without a permit, and seeking joint and several liability to pay a civil penalty up to $10,000 for each day of each violation.

Count Three: Beginning June 7, 2016, placing large piles of material containing "other wastes" as defined by R.C. 6111.01(D) along the perimeter of the Glenwood Road site, causing large piles to wash into an unnamed tributary to Dry Creek, and seeking joint and several liability to pay a civil penalty up to $10,000 for each day of each violation.

Count Four: Between December 2007 until sale of the land comprising the County Road 5 site on December 23, 2019, dewatering and discharging water containing "industrial waste" and/or "other waste" into an unnamed tributary of Fewless Creek, without a valid permit, and seeking joint and several liability to pay a civil penalty up to $10,000 for each day of each violation.

Count Five: Between September 2001 and July 2007, filling a Category 3 wetland at 1616 County Road B without obtaining a permit, and seeking injunctive relief pursuant to R.C. 6111.07(B), as well as joint and several liability to pay a civil penalty up to $10,000 for each day of each violation.

Count Six: On or before February 16, 2012, constructing and installing a wastewater disposal system to serve the WB Ranch at 1640 County Road B without submitting a complete and approvable permit to install, and seeking

injunctive relief pursuant to R.C. 6111.07(B), as well as joint and several liability to pay a civil penalty up to $10,000 for each day of each violation.

{¶ 9} The Wylies filed their answer, denying the allegations. The matter proceeded to a bench trial on September 20, 2022.

{¶ 10} At trial, the state proffered testimony of Thomas Poffenbarger, a water quality engineer with Ohio EPA. Poffenbarger testified regarding the mining sites, establishing the dewatering and discharging without a National Pollutant Discharge Elimination System (NPDES) permit at the Glenwood site and County Road 5 site. Poffenbarger testified that the NPDES permit requires regular testing of the discharge, with no testing during the time the Wylies discharged without a permit. He further testified that materials from the mining operations could negatively impact aquatic life and were considered industrial wastes under the statute.

{¶ 11} Poffenbarger also testified regarding the unpermitted waste disposal system installed at 1640 County Road B, and the efforts of Ohio EPA to bring the site into compliance through a permit submitted with "as-built" plans for the system. He testified that the Wylies never submitted a completed application to Ohio EPA despite repeated communications, requesting the application.

{¶ 12} As to 1616 County Road B, Rahel Babb, an environmental specialist with Ohio EPA, testified regarding the category 3 wetlands identified in 2002 by the Army Corps of Engineers at that site as well as Ohio EPA testing of the land in the following years, in response to complaints of illegal filling. Babb testified regarding her

6.

involvement in investigating those complaints of illegal filling of the wetlands and ongoing enforcement attempts by the agency. Babb identified documents, correspondence, and photographs, demonstrating the disappearance of the wetlands during the period in which the Wylies developed the land to construct an office building and parking lot.

{¶ 13} Both Poffenbarger and Babb testified regarding the length of time of enforcement activities, with Poffenbarger testifying that the Wylies' case was the only one, out of approximately 100 cases, that had gone on for over ten years. Babb testified that the Ohio EPA had been investigating complaints of illegal fill of the wetlands for about 20 years without resolution. The state admitted 34 exhibits, without objection, documenting the repeated violations at each of the sites described in Poffenbarger's and Babb's testimony.

{¶ 14} The defense proffered the testimony of Wiley and Allen Joel ("A.J.") Brenner. The trial court admitted the defense exhibits AA through GG, and JJ, LL, NN, and OO, overruling the state's objections to exhibits BB, CC, EE, FF, JJ, LL, OO.[2]

{¶ 15} Wylie testified that his mining activities were permitted through the ODNR, and he relied on his consultants to ensure his activities were proper. He testified he believed the ODNR permit covered his activities at the mining sites, while also

---

[2] The defense withdrew exhibit HH, KK, and MM, and the trial court sustained the state's objection to admission of exhibit II. The record also demonstrates admission of Exhibit PP, but there is no such exhibit in the record on appeal. Exhibit II, however, is part of the record, included with the admitted exhibits.

7.

acknowledging notices he received that informed him of the need for a NPDES permit. Wylie denied discharging water from his mines into the creeks, asserting he had no need to dewater at the Glenwood Road site until the time he first requested a NPDES permit to discharge from that site. He also acknowledged he never obtained a NPDES permit for the County Road 5 site, but stated he no longer owned the County Road 5 site. Wylie also testified that another entity conducted the mining operations at County Road 5 and compensated Wylie for the land use, with Wylie having no control over those operations, but introduced no supporting evidence for this claim. The ODNR permits referenced by Wylie in his testimony were issued to Wylie & Sons Landscaping LLC.

{¶ 16} As to the two sites at County Road B, Wylie denied any violations. Wylie testified that there were no wetlands on his property at 1616 County Road B, and he did not place fill materials in any wetlands. As to the unpermitted waste disposal system at 1640 County Road B, Wylie testified his engineer was no longer in business and could not be located to request a copy of schematics for the system, and he offered to tear the system out and replace it, but Ohio EPA told him that would not be necessary. Wylie did not address the documentary evidence regarding wetlands, introduced by the state, and provided no support for his claim that Ohio EPA rejected his offer to replace the wastewater treatment system for the horse ranch.

{¶ 17} Throughout his testimony, Wylie did not dispute his lack of permits as alleged or the repeated notices sent by Ohio EPA, instead claiming he was confused by the multiple government agencies or that "everybody lost all my permits." Wylie testified

8.

that he believed the mining permits allowed him to "dewater from the hole you're digging into a subhole that will overflow into a creek bed," and he had been "doing that for 33 years." Wylie also did not dispute that he failed to prepare a delineation report to identify the exact locations of wetlands on the 1616 County Road B property, claiming misunderstanding regarding the Ohio EPA's letter to him, requesting he obtain such a report prior to development. Instead, Wylie argued that the areas of 1616 County Road B that were developed were not wetlands, without the support of the delineation reports that were intended to establish the facts. As to the wastewater treatment system installed at 1640 County Road B, Wylie argued that the engineer who designed the system was out of business or deceased, and he had no way of obtaining the plans for the system installed to complete the required permit years later.

{¶ 18} Finally, A.J. Brenner testified for the sole purpose of authenticating documents. Brenner is a Wiley & Sons employee and is the office manager at the Glenwood Road mining operation. He testified that he submitted diagrams or maps on behalf of the Wylies to the Ohio EPA identifying a pump location at the County Road 5 site in October 2018, in response to the Ohio EPA's request for documentation. Brenner identified the documents he submitted.

{¶ 19} In closing argument, the state summarized the testimony and argued the case is about permit violations, or the failure of the Wylies to acquire permits. The first type of permit was for discharge into waters of the state relative to the Glenwood Road site and the County Road 5 site. The second type of permit concerned the wastewater

9.

treatment system installed at 1640 County Road B. The third type of permit concerned the wetlands once present at 1616 County Road B. The state further noted the Wylies' attempt to confuse the issues by ignoring the strict liability imposed by the environmental laws by arguing a lack of evidence of actual harm resulting from the Wylies' activities.

{¶ 20} In response, the defense acknowledged a lack of permits and attempted to excuse the Wylies from the permit requirements, arguing confusion, mistake, or ignorance of the law. Wylies' counsel maintained the mining permits from the ODNR led Wylie to believe he was following the law. Additionally, the Wylies disputed the existence of wetlands at 1616 County Road B and argued that obtaining plans for the wastewater treatment system was an impossibility, based on the passage of time, without disputing the failure to submit the plans at the time of installation. Finally, the Wylies argued there was a lack of proof that any unpermitted activities caused actual harm.

{¶ 21} At the close of trial, the parties submitted proposed findings of fact and conclusions of law to the trial court, along with supplemental briefs as additional closing argument.

{¶ 22} On July 24, 2023, the trial court issued its decision and order, dismissing Count 1 and entering judgment in favor of the Ohio EPA on Counts 2 through 6, granting permanent injunctive relief as to Counts 5 and 6. The trial court found the Wylies liable regarding the violations alleged in Counts 2 through 6. The trial court imposed a civil penalty of $10,740 against the property owners (Wylie, Nicholas, and Lisa), and against Wylie & Sons Landscaping, LLC and Wylie and Sons Sand and Stone, jointly and

10.

severally, for violations at the Glenwood Road site in Wood County. The trial court imposed a civil penalty of $15,000 against the property owners (Wylie and Lisa) and Wylie & Sons Landscaping, LLC, jointly and severally, for violations at the County Road 5 site. The trial court imposed a civil penalty of $7,500 against the property owners (Wylie and Lisa) for violations at 1616 County Road B, with abatement upon purchase of two wetland credits. Finally, the trial court imposed a civil penalty of $17,500 against the property owners (Wylie and Lisa) and Thomas J. Wylie, Sr, dba WB Ranch and Arena, jointly and severally, for violations at 1640 County Road B, with abatement upon submission of engineering plans.

{¶ 23} Appellant filed a timely appeal from this judgment.

### III.  Assignment of Error

{¶ 24} On appeal, appellants assert the following assignments of error:

1. The trial court erred in finding that industrial waste was discharged into the waters of the state from the Glenwood Road property.

2. The trial court erred in finding that Wylie failed to obtain a modified dewatering permit for the County Road 5 property.

3. The trial court erred in finding that Wylie filled wetlands on County Road B.

4. The trial court erred in finding that Wylie failed to provide as built drawings of the wastewater treatment facility on County Road B.

11.

5. The trial court erred in finding that Defendants were recalcitrant causing an excessive civil penalty to be awarded.

6. The trial court erred in Awarding Civil Penalties Against Nominal Defendants.

### IV. Analysis

{¶ 25} The Wylies do not dispute the lack of Ohio EPA permits, but instead, reiterate the argument raised in the trial court. As to liability, the Wylies argue the trial court erred in its legal determination of the effect of their failure to obtain permits, disputing evidence of pollution or actual harm. As to the civil penalties, they also argue the trial court erred in finding recalcitrance and erred in imposing penalties against "nominal defendants."

{¶ 26} The violations in this case are (1) discharge into the waters of the state without a permit, (2) placing fill materials in wetlands without a permit, and (3) installing an unpermitted wastewater treatment system. In challenging the trial court's judgment, the Wylies challenge the findings regarding liability, arguing a lack of evidence of pollution or harm or proof on each violation claimed by the state and challenging the factual finding of recalcitrance as to enforcement actions at each site. Such a challenge is reviewed based on the manifest weight of the evidence standard. *See, e.g., State ex rel. Cordray v. Helms,* 2011-Ohio-569, ¶ 18 (in challenging the trial court's factual determination, appellant essentially challenges the judgment as against the manifest weight of the evidence).

12.

{¶ 27} Because this matter is a civil proceeding, the state was required to establish its claims by a preponderance of the evidence. (Citation omitted) *State ex rel. DeWine v. Valley View Ents., Inc.,* 2015-Ohio-1222, ¶ 24 (11th Dist.). In applying the civil manifest weight of the evidence standard on appeal, we will only reverse if we find the record demonstrates a lack of "some competent, credible evidence going to all the essential elements of the case[.]" *State v. Wilson,* 2007-Ohio-2202, ¶ 24, quoting *C.E. Morris Co.,* 54 Ohio St.2d 279, syllabus (1978).

{¶ 28} The challenge to the trial court's imposition of civil penalties is reviewed for an abuse of discretion. *See State, ex rel. Brown v. Dayton Malleable, Inc.,* 1 Ohio St.3d 151, 158 (1982). A trial court abuses its discretion when its decision is unreasonable, arbitrary or unconscionable. *Marlowe v. Marlowe,* 2023-Ohio-1417, ¶ 133 (6th Dist.), citing *State ex rel. Askew v. Goldhart,* 75 Ohio St.3d 608, 610 (1996). Thus, to find an abuse of discretion, we must determine the trial court's decision lacked sound reasoning, or lacked a legal basis, or "affronts the sense of justice, decency, or reasonableness." (Citations omitted) *Marlowe* at ¶ 133. An abuse of discretion requires more than a difference of opinion regarding the trial court's decision and requires a finding that the judgment is "so profoundly and wholly violative of fact and reason that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." (internal quotations omitted) *State v. Weaver,* 2022-Ohio-4371, ¶ 24.

13.

{¶ 29} While the Wylies do not articulate the applicable standard within their assignments of error, we construe the challenges to the trial court's liability determinations as a weight of the evidence challenge. We likewise construe the challenge regarding the trial court's assessment of civil penalties as an abuse of discretion challenge. However, in addition to applying these standards in our review, we must first address arguments raised within the assignments of error. The Wylies argue a lack of intent to commit any violation, as well as a lack of sufficient evidence of actual harm. For ease of discussion, we address these arguments first, followed by consideration of the assignments of error, applying the appropriate standard of review as to each assigned error.

### A. The state did not need to prove intent to commit a violation to establish a violation and receive civil penalties under R.C. Chapter 6111.

{¶ 30} In their first, second, third, and fourth assignments of error, the Wylies argue a lack of knowledge or a misunderstanding, pertaining to their intent to commit a violation. In support, they cite no law that requires the state to establish an intent to violate the provisions of R.C. Chapter 6111 to demonstrate the claimed violations. Instead, R.C. 6111.07(A) expressly states that "no person shall violate or fail to perform any duty imposed by sections 6111.01 to 6111.08" and R.C. 6111.09 requires imposition of a civil penalty on "any person who violates section 6111.07[.]"

{¶ 31} There is no provision within R.C. 6111.09, or anywhere else within R.C. Chapter 6111, indicating the state must prove intent to obtain judgment in a civil proceeding on violations. Although we have not specifically addressed the issue, other

14.

jurisdictions have construed the statute as creating strict civil liability. *See, e.g. State ex rel. DeWine v. Deer Lake Mobile Park,* 2015-Ohio-1060, ¶ 50 (11th Dist.) ("owners and operators of public water and sewage disposal systems are liable for water supply and pollution violations *regardless of intent.*) (emphasis sic.); *State v. Tri-State Group, Inc.,* 2004-Ohio-4441, ¶ 95 (7th Dist.) (any violation subjects the violator to a civil penalty under R.C. 6111.07 and 6111.09). Additionally, federal courts, construing the federal Clean Water Act and Ohio's related provisions, have determined that "Ohio law imposes strict liability ("no person shall…") for violations of public welfare statutes like R.C. 6111.04." *United States v. Osborne,* 2022 WL 18135184 (N.D. Ohio), citing *Kelly v. EPA,* 203 F.3d 512, 522 (7th Cir.2000), citing *United States v. Winchester Municipal Utilities,* 944 F.2d 301, 304 (6th Cir.1991).

{¶ 32} While we address strict civil liability for the first time with this case, we have addressed the issue regarding similar environmental statutes which provide for criminal prosecution, with similar language, and determined those statutes also create strict criminal liability for violations. *See, e.g., State v. Budd Co.,* 67 Ohio App.2d 23, 26 (6th Dist.1980) (construing R.C. 1531.29, which provides "No person shall place or dispose of in any manner, any garbage, waste…oil, or anything else" in the waters of the state as imposing strict liability); *see also State/Div. of Wildlife v. Coll,* 2017-Ohio-7270, ¶ 19 (6th Dist.)(finding strict liability for violations of R.C. 1533.11, failure to carry/display a hunting permit).

15.

**{¶ 33}** Accordingly, lacking any language concerning a mental state or intent, we find R.C. 6111.04 and 6111.07 impose strict liability for violations, requiring consideration of the appropriate civil penalty. Therefore, the Wylies' argument regarding an "intent" element to sustain liability and civil penalty determinations lacks merit.

### B. Actual harm is not a consideration in determining liability relative to the violations at issue.

**{¶ 34}** In addition to arguing an "intent" element relative to the state's claims, the Wylies also argue the state was required to present evidence of actual harm. In their first, second, third, and fourth assignments of error, the Wylies challenge the lack of evidence of actual harm arising from the violations asserted by the state. In support, they cite no authority that requires evidence of harm. Upon thorough review, we find no support for an "actual harm" element, consistent with Ohio law.

**{¶ 35}** Ohio's water pollution laws prevent and protect against harm in addition to mitigating or remedying harm. The general assembly created the Ohio EPA to administer laws and regulations "pertaining to the prevention, control and abatement of air and water pollution, public water supply, and the disposal and treatment of solid and other wastes." *State ex rel. Brown v. Rockside Reclamation, Inc.,* 48 Ohio App.2d 157, 167-168 (8th Dist. 1975). Pursuant to R.C. Chapter 6111, the actionable offense could be the threat to the environment, with no requirement to prove "actual harm" caused by violations. *State ex rel. DeWine v. Deer Lake Mobile Park,* 2015-Ohio-1060, ¶ 44 (8th Dist.); *see also State ex rel. Yost v. Osborne Co., Ltd.,* 2020-Ohio-3090, ¶ 68 (11th Dist.).

16.

{¶ 36} In this case, however, the Wylies failed to obtain permits, required to prevent pollution and protect the environment, and committed acts that did produce harm, based on testimony adduced by the state at trial. Thus, the law did not require proof of actual harm arising from violations, and the state nevertheless presented evidence demonstrating harm. Therefore, the Wylies' argument regarding evidence of harm is without merit.

### C. The record supports the trial court's finding that industrial waste was discharged into the waters of the state from the Glenwood Road property.

{¶ 37} In their first assignment of error, the Wylies argue that the state failed to present evidence of a "pollutant" entering the waters of Dry Creek. Specifically, the Wylies argue the state presented no evidence of water discharged into the waterway prior to obtaining a NPDES permit and no evidence of any harm caused by a pollutant that was discharged from the mine and into the waterway. In support, they argue the mining permits allowed dewatering, and they subsequently obtained a NPDES permit from Ohio EPA, with that permit allowing the same type of activity that they were accused of engaging in, prior to receiving the permit.

{¶ 38} The state alleged the Wylies discharged industrial waste materials into a tributary of Dry Creek, in violation of R.C. 6111.04(A)(1), which prohibits placing industrial waste materials "in a location where they cause pollution of any waters of the state." The Wylies claim a permit for dewatering the mine and do not dispute placement of material along the edge of the property. As noted by the state, the Wylies could have dewatered the mine without discharging the waste into the waterways, with the discharge

the prohibited conduct, not the mining activity. The Wylies' argument does not address the law governing discharge or the facts demonstrated at trial.

{¶ 39} First, the Wylies treat dewatering a mine and discharging into the waters of the state as synonymous. Ohio law concerning discharge, however, concerns water quality and not mining. Ohio water quality policy conforms to federal water quality standards. *Columbus & Franklin Cty. Metro. Park Dist. v. Shank,* 65 Ohio St.3d 86, 100 (1992). Pursuant to this policy, all discharge of pollutants in the waters of the state are prohibited, but upon obtaining an NPDES permit, regulated discharge is allowed. *See Id., see also* Ohio Adm.Code Chapter 3745-33. *Id.* The pertinent issue at trial was discharge into the Creek, not dewatering.

{¶ 40} The Wylies' argument also fails to address the evidence proffered at trial. The state presented evidence of discharges from the Glenwood site and notice to Wylie of the need to obtain a NPDES permit as early as September 2016, with a September communication with Wylie memorialized in a notice of violation letter dated October 13, 2016. The violation notice required action regarding discharge of industrial waste materials without a permit. On December 16, 2016, Ohio EPA sent follow-up correspondence that noted discussion with Wylie regarding a NPDES permit. After no action was taken by Wylie, Ohio EPA sent second and third notices of violation, on February 17 and December 28, 2017. Wylie submitted the application for a NPDES permit on February 21, 2018. Without addressing the state's evidence, the Wylies argue

18.

the trial court "missed the significance" of Wylie's testimony regarding his activities, denying any unpermitted discharge into the Creek.

{¶ 41} As to pollution, the Wylies argue that any discharge contained no pollution and resulted in no harm, as the discharge would have consisted of water and naturally occurring materials from the mine. They argue that the state's position, that any material is a pollutant "when it results from industrial activity" is incorrect. However, the Wylies' position contradicts the definition provided by R.C. 6111.01, which defines "pollution" as the "placing of any sewage, sludge, sludge materials, industrial waste, or other wastes in any waters of the state." R.C. 6111.01(A). "Industrial waste" is further defined as "any liquid, gaseous, or solid waste substance resulting from *any process of industry*." R.C. 6111.01(C). The state's adherence to the statutory definition, therefore, is correct, and consideration of "pollutants" based on extrinsic definitions has no basis in law.

{¶ 42} Applying this law to the evidence adduced at trial, the state presented clear and convincing evidence to support the trial court's determination of violation relative to the Glenwood site. The trial court noted Poffenbarger's testimony that the Wylies' sand and stone quarry operation required removing water from the bottom of the quarry, which was pumped into a small settling pond before traveling through a drainage pipe to a tributary of Dry Creek, which is a water of the state. The Wylies also piled materials from the mine near the tributary, where run-off deposited materials into the tributary of Dry Creek, a water of the state. Poffenbarger further testified that this discharge into the waters of the state occurred without a NPDES permit. In challenging this finding on

19.

appeal, the Wylies either ignore the law or disregard the state's evidence. Applying the law to the evidence of record, however, we find the first assignment of error not well-taken.

### D. The record supports the trial court's finding that Wylie discharged into a waterway of the state without obtaining a permit for the County Road 5 property.

{¶ 43} In their second assignment of error, the Wylies argue that the state failed to demonstrate a failure to seek a permit, or that any "pollutant" was discharged into Fewless Creek. Specifically, the Wylies assert error relative to a "dewatering permit." In support, the Wylies argue that they obtained ODNR approval to dewater the mine on County Road 5, and after learning that Ohio EPA oversaw discharging into the Creek, the Wylies applied for a NPDES permit but Ohio EPA did not act on the application by issuing a permit. Thus, while acknowledging they never obtained a permit from Ohio EPA, the Wylies argue the trial court erred in finding they failed to obtain a permit, referring to a dewatering permit as the proper authorization for discharging into the tributary of Fewless Creek.

{¶ 44} We note the dispute over Ohio EPA's response to the permit application but find a delay by Ohio EPA to be of no relevance to the issue at trial, the violations. Wylies' argument of the delay in responding to the application sounds in estoppel, and "[e]stoppel, in general, does not apply against the state or its agencies in the exercise of a governmental function." *State ex rel. Petro v. Maurer Mobile Home Court, Inc.,* 2007-Ohio-2262, ¶ 74 (6th Dist.), citing *Hartman v. City of Miamisburg,* 2006-Ohio-4251, ¶ 20.

A failure "to act as expeditiously as possible" will not prevent the state from protecting the public welfare. *Id.,* citing *Sekerak v. Fairhill Mental Health Ctr.,* 25 Ohio St.3d 38, 39 (1986).

{¶ 45} The discharge into the waters of the state without a NPDES permit was the pertinent issue at trial, with "dewatering" and "discharging" separately regulated activities. While the ODNR may have issued a permit for dewatering, "[i]n Ohio, the [Ohio EPA] has been delegated the authority to issue NPDES permits for the discharge of pollutants into Ohio waters." *Fairfield Cty. Bd. of Commrs. v. Koncelik,* 2013-Ohio-2106, ¶ 6 (10th Dist.). Furthermore, all discharge of pollutants, as defined at R.C. 6111.01, is prohibited unless the discharge is permitted and regulated through a NPDES permit, as provided under Ohio Adm.Code Chapter 3745-33. *See Columbus & Franklin Cty. Metro. Park Dist.,* 65 Ohio St.3d at 100. Finally, as shown above, the definition of "pollution" and "industrial waste" is found within R.C. 6111.01, and the Wylies provide no authority for applying a definition not found within the statute.

{¶ 46} To support its claim regarding the County Road 5 property, the state presented evidence at trial demonstrating Wylie applied for a NPDES permit in 2008, but his application was defective because it lacked a required signature and topographic maps. Ohio EPA notified Wylie of the deficiencies, but Wylie continued to discharge from the County Road 5 mine into the tributary of Fewless Creek without submitting a completed application. Furthermore, while Wylie claimed that Ohio EPA cashed his second check, attached to a second application, there was no evidence of a permit issued

21.

based on a second application. Instead, in 2016, Ohio EPA sent Wylie a letter directing him to apply for a NPDES permit. Throughout this time, the Wylies continued the activities from the County Road 5 mine.

{¶ 47} Considering the record, the state presented competent, credible evidence to support the trial court's determination that the Wylies discharged industrial waste into waters of the state without a NPDES permit. Therefore, we find the second assignment of error not well-taken.

### E. The record supports the trial court's finding that Wylie filled wetlands on County Road B.

{¶ 48} In their third assignment of error, the Wylies argue the trial court erred in finding he placed fill materials into wetlands at 1616 County Road B, based on his claim that there were no wetlands present at the time he developed the property. The Wylies acknowledged receipt of notice from the Army Corps of Engineers regarding the presence of wetlands, but claimed – without supporting documentation or evidence – that they did not need to take any action regarding wetlands because they avoided the wetlands areas in developing the property.

{¶ 49} At trial, Wylie seemed to argue that wetlands were not present because he never saw any wetlands. A "wetland" is an area "inundated or saturated by surface or ground water at a frequency and duration that are sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." Ohio Admin.Code 3745-1-02(107). A "wetland" could include

22.

swamps, marshes, bogs, and other, similar areas identified by the U.S. Army Corps of Engineers pursuant to its delineation manual or other procedures. *Id.* Pursuant to R.C. 6111.02(A), the quality of a "wetland" is determined based on application of the rule set forth in Ohio Admin.Code 3745-1-54.

{¶ 50} At trial, the state presented testimony demonstrating the wetlands had been designated as isolated, category 3 wetlands, or the highest quality wetlands as defined in the Ohio Administrative Code. *See* Ohio Admin.Code 3745-1-54(C)(3)(a)-(c). The state further presented evidence, including correspondence, documents, and historical photographs, demonstrating clear notice to the Wylies of high-quality, isolated wetlands present in the northern portion of the property and the gradual disappearance of those wetlands, after development that included an office building and paved parking lot. The state also presented evidence of fill materials, including gravel, wood chippings, and other construction debris, present in the area where wetlands had been present, prompting a notice of violation to the Wylies in 2007.

{¶ 51} In challenging the trial court's findings regarding the filling of wetlands at the 1616 County Road B property, the Wylies dispute the facts regarding the presence of wetlands based solely on Wylie's testimony that there were no wetlands and ignoring Wylies' admission that the Army Corps of Engineers advised him to consult a professional before building on the northern part of the property where Wylie admittedly constructed his office and parking lot, without consulting a professional. On appeal, the Wylies argue the trial court erred in not crediting the conflicting testimony as dispositive

23.

on the presence of wetlands, without addressing the repeated notice the Wylies received regarding the presence of wetlands and the need for Ohio EPA approval prior to development. Thus, the Wylies challenge the trial court's credibility determination regarding the presence of wetlands.

{¶ 52} In reviewing the record, we find competent, credible evidence of both the existence of wetlands and the disappearance of those documented wetlands due to placement of fill materials, and we defer to the trial court's credibility determination regarding Wylie's testimony. *See Seasons Coal Co., Inc. v. City of Cleveland,* 10 Ohio St.3d 77, 81 (1984). Therefore, we find the third assignment of error not well-taken.

### F. The record supports the trial court's finding that Wylie failed to provide plans for the wastewater treatment facility on County Road B.

{¶ 53} In their fourth assignment of error, the Wylies argue the trial court erred in determining liability based on a failure to submit as-built drawings for their wastewater treatment system because any violation was merely technical, considering the proper functioning of the system installed. Again, the Wylies acknowledge the failure to submit a completed permit application with "as-built" plans but argue that a liability finding was error based on a lack of intent or evidence of actual harm caused by their conduct.

{¶ 54} We previously determined that the state need not present evidence of intent or harm to support a violation. Furthermore, the conduct alleged, a failure to submit "as-built" plans to remedy installation of a wastewater treatment system without a permit, is admitted by the Wylies. The Wylies, moreover, provide no support for a "technical"

24.

violation under the statute. Instead, they acknowledge a violation, and the statute imposes strict liability.

{¶ 55} We therefore find the fourth assignment of error not well-taken.

**G.  The record supports the trial court's determination that the appellants were recalcitrant, meriting a civil penalty.**

{¶ 56} In their fifth assignment of error, the Wylies challenge the trial court's finding that they were recalcitrant, meriting the award of civil penalties. In support, they argue that they presented "reasonable explanations" why they failed to obtain permits and the trial court impermissibly relied on its finding of recalcitrance to justify civil penalties.

{¶ 57} As previously addressed, R.C. 6111.09(A) provides that "any person who violates section 6111.07 of the Revised Code *shall pay* a civil penalty of not more than ten thousand dollars per day of violation." (Emphasis added). Therefore, the trial court's imposition of civil penalties was not based on its finding of recalcitrance, but upon a finding of violation. To the extent the Wylies dispute the amount of the civil penalties imposed, moreover, it is well-settled law that "the amount of a civil penalty imposed for a violation of pollution-control policies lies within the discretion of the trial court[.]" *State ex rel. Ohio Atty. Gen. v. Shelly Holding Co.,* 2012-Ohio-5700, ¶ 23, citing *State ex rel. Brown v. Dayton Malleable,* 1 Ohio St.3d 151, 157-158 (1982).

{¶ 58} The statute expressly sets a limit of ten thousand dollars for *each day* of violation, and below this cap, the amount "rests in the informed discretion of the court." (Citation omitted) *State ex rel. Petro v. Maurer Mobile Home Court, Inc.*, 2007-Ohio-

25.

2262, ¶ 54 (6th Dist.). An abuse of discretion connotes that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

{¶ 59} Here, the trial court considered factors, adopted from federal EPA policy and deemed appropriate by the Ohio Supreme Court in *State ex rel. Brown v. Dayton Malleable, Inc.,* 1 Ohio St.3d at 156; *see also State ex rel. Yost v. Osborne Co., Ltd.,* 2020-Ohio-3090, ¶ 64 (11th Dist.) (noting a court's discretion to apply these factors in assessing a civil penalty, although the statute does not require it). The trial court considered the following factors: "(1) the harm or risk of harm posed to the environment by the violations; (2) the violator's level of recalcitrance, defiance, or indifference to the law; (3) the economic benefit gained by the violation; and (4) the extraordinary enforcement costs incurred by the state." *State ex rel. DeWine v. Deer Lake Mobile Park,* 2015-Ohio-1060, ¶ 44 (11th Dist.), citing *Dayton Malleable* at 157-158.

{¶ 60} On appeal, the Wylies argue the trial court only considered the recalcitrance factor. As to this factor, the trial court found that the Wylies failed to obtain required permits in a timely fashion despite extensive enforcement efforts, with Nicholas and Lisa displaying indifference by failing to appear at trial regarding violations on their property and Wylie expressing his defiance in testimony, claiming he had been in the sand mining business for over 30 years without a NPDES permit. The trial court found a consistent refusal to comply with permit requirements.

26.

**{¶ 61}** As to the individual properties, the trial court found the Glenwood Road quarry operated without an NPDES permit for at least 537 days and the County Road 5 quarry operated without an NPDES permit for 702 days. The trial court also found the violations arising from destruction of wetlands at 1616 County Road B occurred as early as August 12, 2002, the date of the site assessment performed by Ohio EPA, and continue to the present with the Wylies failing to submit an after-the-fact isolated wetland fill permit request, despite numerous violation notices received for about 20 years. Likewise, the violations at 1640 County Road B occurred as early as January 25, 2012, the date of the site inspection, and continue to the present as the Wylies failed to submit "as-built" plans for the wastewater treatment system so that a permit might be issued.

**{¶ 62}** Additionally, the trial court considered the other factors. The trial court noted the Wylies gained an economic benefit by avoiding the significant costs associated with complying with the applicable environmental laws and regulations by obtaining permits. Additionally, the trial court determined the Wylies' violations caused harm to the environment, specifically referencing testimony regarding the harmful effect of excess sediment discharged into waters of the state, the destruction of high-quality wetlands, and the public health concerns regarding an unpermitted wastewater system. Finally, the trial court found that Ohio EPA incurred extraordinary costs because of extraordinary enforcement efforts, spanning many years.

27.

**{¶ 63}** Considering this record, we find no abuse of discretion by the trial court in imposing civil penalties well within the potential range of penalties. We therefore find the fifth assignment of error not well-taken.

### H. The "nominal defendants" were titled owners, and therefore proper parties against whom the trial court assessed civil penalties.

**{¶ 64}** Finally, in their sixth assignment of error, the Wylies argue error in assessing penalties against "nominal defendants," who were merely record owners of the properties at issue. The Wylies argue that because Nicholas and Lisa Wylie were merely record owners of the property, and not involved in any of the conduct that resulted in violations, they could not be found liable and assessed civil penalties.

**{¶ 65}** We note that the state specifically asserted Nicholas and Lisa Wylie were proper parties having individual liability within the complaint. In answer, the Wylies raised the affirmative defense of misjoinder of parties, but limited denials to challenging party-status of Wylie & Sons Sand and Stone and Wylie as owner or operator of the WB Ranch and Arena, located on the 1650 County Road B property. The Wylies did not otherwise deny the allegations as to the individual liability of Nicholas and Lisa. Neither Nicholas nor Lisa appeared for trial.

**{¶ 66}** At trial, the state presented evidence regarding ownership for each property, as recorded in the county auditor's offices in Wood and Fulton counties. The Wylies did not dispute this ownership evidence. Significantly, the Wylies never addressed the "nominal" status of Nicholas and Lisa by introducing evidence during trial. Despite failing to place the issue of individual liability of Nicholas and Lisa in dispute, as

28.

alleged in the pleadings, the Wylies raised the issue for the first time in their post-trial brief, arguing Nicholas and Lisa were improper defendants because the state failed to present evidence on their individual liability, ignoring evidence of ownership and notice regarding violations on their respective properties.

{¶ 67} Additionally, we find the argument of "nominal" party unclear, relative to Nicholas and Lisa's ownership of the property and resulting liability under R.C. Chapter 6111 for violations arising from their property. A "nominal" owner is a legal owner. *Ohio Div. of Real Estate v. Vantell,* 128 Ohio App.3d 410, 416 (7th Dist.1998), citing Restatement of Law, Property (1929). The record, moreover, is silent on this "nominal" theory of liability, because the Wylies never denied individual liability at the pleadings stage and put forth no argument or evidence in the trial court to demonstrate "nominal" status.

{¶ 68} In considering the evidence, the trial court did find insufficient evidence of Nicholas' liability as to Count 4 and the County Road 5 property, but otherwise found individual liability on Counts pertaining to properties Nicholas and Lisa did own. Considering this record, we find sufficient, credible evidence to support the finding of individual liability against Nicholas and Lisa, as determined by the trial court in its judgment. Accordingly, we find the sixth assignment of error not well-taken.

29.

## V. Conclusion

**{¶ 69}** Having found substantial justice has been done, we affirm the judgment of the Wood County Court of Common Pleas. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.